# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1438

_____

| | | |
|---|---|---|
| Terry B. and John B.,[1] | * | |
| | * | |
| Appellants, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the Eastern |
| P. H. Gilkey and Cynthia Mahomes, | * | District of Arkansas. |
| in Their Individual and Official | * | |
| Capacities, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: February 14, 2000

Filed: October 10, 2000

_____

Before WOLLMAN, Chief Judge, and BOWMAN and MORRIS SHEPPARD
ARNOLD, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Two children sued for damages to compensate for the physical, emotional, and
sexual abuse that they assert that they suffered after the Arkansas Department of

---

[1]At trial, recognizing that the plaintiffs were no longer minors, the court removed
the language in the caption reflecting that the plaintiffs' mother was acting as their
representative. For the sake of simplicity, we refer to the plaintiffs as "the children" in
this opinion.

Human Services (DHS) took them from an inpatient psychiatric hospital in mid-1989 and delivered them to their aunt and uncle, who had obtained guardianship of them and retained it until mid-1994 (approximately 56 months). The defendants were the DHS, several of its employees, and the children's aunt and uncle.

At trial, the court[2] granted judgment as a matter of law, *see* Fed. R. Civ. P. 50(a)(1), to the defendants[3] at the end of the children's case. The children appeal solely with respect to P. H. Gilkey, a DHS supervisor responsible for child protective services, including foster care, and Cynthia Mahomes, a social worker for DHS who worked with children in foster care and with children for whom protective services had been ordered. We affirm.

## I.

In mid-1985, for reasons not material here, the Arkansas Department of Human Services (DHS) acquired custody, *see* Ark. Code Ann. § 9-27-334(a)(1), *see also* § 9-27-303(1), § 9-27-303(12), § 9-27-303(15)(A), of Terry B. and John B. (pseudonyms), a sister and brother. At that time, Terry B. was six years old, and John B. was five years old.

After placing the children in foster care elsewhere between 1985 and 1987, *see* Ark. Code Ann. § 20-76-201(2)(B), *see also* § 9-27-303(26), § 9-27-303(30)(A)(i), the DHS placed them with their aunt and uncle for approximately 12 months in 1987 and 1988. According to testimony at trial, the DHS apparently characterized this arrangement as a "placement with a relative" rather than "foster care." We believe, however, that, under the law, the placement was indeed foster care, but with the

---

[2]The Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

[3]The aunt and uncle had earlier declared bankruptcy and thus were not defendants at the time of trial. *See* 11 U.S.C. § 362(a)(1).

statutory preference having been given to relatives of the children. *See* Ark. Code Ann. § 9-9-102(a); *see also* § 9-27-303(26), § 9-27-303(30)(A)(i).

In any event, for reasons unrelated to any conduct of the aunt and uncle, the DHS moved the children to other foster care placements between 1988 and mid-1989. After behaving violently at the last of these, the children were sent to an inpatient psychiatric facility. More or less contemporaneously with the children's last placement before hospitalization, the aunt and uncle had petitioned to obtain guardianship of the children, *see* Ark. Code Ann. § 28-65-205(a), § 28-65-206, *see also* § 28-65-104(1), § 28-65-204(b)(4), and a probate court granted that petition, *see* Ark. Code Ann. § 28-65-107(a), while the children were hospitalized.

As a consequence, the DHS sent defendants Gilkey and Mahomes to remove the children from the inpatient psychiatric facility and to deliver them to their aunt and uncle. The children maintain that they expressed vehement resistance to defendants Gilkey and Mahomes on that day, telling the DHS workers at that time (and possibly earlier) that the aunt and uncle had been repeatedly abusive to them (physically, emotionally, and in Terry's case sexually) during their 1987-1988 stay.

II.

Reduced to its essence, the children's first argument is that because they were minors in the custody of the DHS for the purpose of placement in foster care, the state restrained their liberty to such an extent that an affirmative duty arose to protect them from abuse in any environment in which the state placed them. Since the state knew, moreover, of the children's previous maltreatment by their aunt and uncle, the state's affirmative duty to protect the children required that it not allow them to be returned to the abusive environment in the home of their aunt and uncle. *See DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 198-200 (1989); *see also id.* at 197-98 n.4, 200 n.8, 201 n.9. In addition, *see Davis v. Fulton County, Arkansas*, 90 F.3d 1346, 1350 (8th Cir. 1996), and *Gregory v. City of Rogers,*

*Arkansas*, 974 F.2d 1006, 1010 (8th Cir. 1992) (*en banc*), *cert. denied*, 507 U.S. 913 (1993).

There is at least one insuperable barrier to this argument, and that is that the children admitted in the trial court that the DHS lost, and that their aunt and uncle gained, custody of them in the probate court hearing, which took place on the day that defendants Gilkey and Mahomes removed them from the inpatient psychiatric facility. Since the DHS lost custody on that date, the state exercised no restraint of the children's liberty after that date and therefore no longer had a duty, if one ever existed, to protect them with respect to subsequent events.

We do not consider arguments raised for the first time on appeal. *See*, *e.g.*, *Von Kerssenbrock-Praschma v. Saunders*, 121 F.3d 373, 376-77 (8th Cir. 1997). Even if we were to do so, however, and were to hold, as the children obliquely argue in their appellate briefs, that custody did not pass until the probate court entered a written order a month after the hearing, *see Standridge v. Standridge*, 769 S.W.2d 12, 14, 298 Ark. 494, 497-98 (1989), there is no evidence that the children suffered any abusive treatment before that time. Any affirmative duty of protection that the state might have had because it had custody of the children therefore ended before any actionable injury occurred.

III.

The children argue that the state continued to have an affirmative duty to protect them after the aunt and uncle took custody, because the probate court directed the DHS to "maintain an open Protective Services case on these minor child[ren] for future assistance and services that are deemed necessary." We disagree.

The only statutory definition of "protective services" in Arkansas law relates to the abuse of adults, not children. That statute defines "protective services" as including (but not limited to) evaluation of the need for services, arrangements for appropriate

services, assistance in obtaining financial benefits to which the adult is entitled, and securing medical and legal services. *See* Ark. Code Ann. § 5-28-101(10)(B). The statute further states that "protective services" may include referrals for community or legal services, seeking protective custody, a guardianship, or court-ordered services for an endangered adult, and referrals to law enforcement authorities. *See* Ark. Code Ann. § 5-28-101(10)(C). The Arkansas statutes related to children include a reference to "family services," which encompass "services provided to a juvenile or his [or her] family," including (but not limited to) child care, homemaker services, crisis counseling, cash assistance, transportation, family therapy, and evaluation of the need for medical treatment or psychological counseling. *See* Ark. Code Ann. § 9-27-303(21)(A).

At trial, defendant Mahomes testified that she understood "protective services" to include supervising family visits, assisting families in carrying out court orders, arranging for counseling and medical care and payment therefor, and providing transportation. The head of the DHS at the relevant time testified that he understood "protective services" to include home studies in some cases.

The lawyer for the DHS at the relevant time testified that a "protective services" order allows the DHS to help a family to obtain whatever services its members request but that the DHS conducts "no monitoring ... [or] periodic visitation" and takes no "initiative to talk to the family and say, 'What can we do for you to make sure that these children are taken care of?' " The lawyer for the DHS at the relevant time also testified that even if a court ordered some counseling for a child in a guardian's custody, he believed that the DHS would have no duty under a "protective services" order to "see that [the guardian] got [the child] to counselling."

At trial, the children offered testimony from a psychologist who supervised therapy for children who were referred to her by the DHS. She stated that the import of a "protective services" case is that the DHS believes that "the family needs some services to keep the children safe, whether those may be treatment or help ...

financially, to get electricity back on and that sort of thing, housing, just to do in-home visits to make sure [that] things are going okay, to help the family [get] access [to] services like ... mental health treatment, medical treatment, those kinds of things."

None of the statutory language or the testimony supports the children's argument that the court's order for "protective services" had the effect of allowing the DHS to restrain the children's liberty.  Without such restraint, the DHS had no constitutional duty to protect the children after the probate court's order, no matter what duty may have existed under state law.

## IV.

The children's last argument is that defendants Gilkey and Mahomes are liable on the separate ground that, even if the state no longer had custody of the children, the DHS knew that by returning the children to their aunt and uncle, the children were returning to an abusive environment, yet the DHS still did so, thus creating a danger to them. *See*, *e.g.*, *S.S. by Jervis v. McMullen*, No. 98-1732, 2000 WL 1335549 at *1-*2 (8th Cir. Sept. 13, 2000) (*en banc*).  We reject this argument as well.

In *DeShaney*, 489 U.S. at 201, the Court stated that "the State does not become the permanent guarantor of an individual's safety by having once offered him [or her] shelter" if the state "played no part in [the] creation [of subsequent dangers to that individual and] did ... [nothing] to render him [or her] any more vulnerable" to those dangers than the individual already was.  *See also Carlton v. Cleburne County, Arkansas*, 93 F.3d 505, 508-09 (8th Cir. 1996).  The DHS certainly did nothing to exacerbate the environment at the home of the children's aunt and uncle.  Nor did it somehow cause custody to be given to the aunt and uncle, who themselves had petitioned for and acquired guardianship over the children.  We think that it cannot be constitutionally irrelevant that the DHS was under a legal obligation to deliver the children into the aunt and uncle's custody.

Even if the DHS, before giving the children up, was under an obligation to petition the probate court for reconsideration of the custody order when the children said that the aunt and uncle had abused them, we believe that the DHS "did not *increase* the danger of significant harm" to the children; by delivering the children to the aunt and uncle, defendants Gilkey and Mahomes "merely placed [the children] back into [a] situation from which [the DHS] had originally retrieved [them]" (emphasis supplied), *S.S.*, 2000 WL 1335549 at *1; *see also id.* at *2. Defendants Gilkey and Mahomes are therefore not liable on a theory of state-created danger for returning the children to their aunt and uncle.

Finally, even if we assume that the state acted affirmatively to create a danger to the children in this case, no liability would attach here because the children have made out, at most, only a case for negligence. Mere negligence, as we have repeatedly held, does not "shock the conscience," *id.* at *3, and therefore cannot give rise to a claim for a violation of substantive due process rights.

V.

For the reasons stated, we affirm the judgment of the trial court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.