# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3211

_____

| | | |
|---|---|---|
| Melissa Dawn Beck, | * | |
| | * | |
| Plaintiff/Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Roy C. Wilson; Felix Vincenz; | * | |
| Enrique Dos Santos; Kenneth Lyle, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| Frances J. Joy, | * | Appeal from the United States |
| | * | District Court for the |
| Defendant/Appellant, | * | Western District of Missouri. |
| | * | |
| John D. Nacy, | * | |
| | * | |
| Defendant, | * | |
| | * | |
| Julie Houchins, | * | |
| | * | |
| Defendant/Appellant, | * | |
| | * | |
| Paul West; Darlene Kelley, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| Michael Cox, | * | |
| | * | |
| Defendant/Appellant, | * | |
| | * | |

Billie Jean Oakley; Vicky Cole;          *
Dewey Potter,                            *
                                         *
          Defendants.                    *
                    _____

                 Submitted:  April 12, 2004
                    Filed:  July 29, 2004
                    _____

Before MORRIS SHEPPARD ARNOLD, RILEY, and COLLOTON, Circuit Judges.
                    _____

RILEY, Circuit Judge.

While involuntarily committed at the Fulton State Hospital Alcohol and Drug Abuse Rehabilitation Unit (ADA Unit), Melissa Dawn Beck (Beck) alleges she was sexually assaulted by a fellow male patient. Beck filed this lawsuit under 42 U.S.C. § 1983 (2000) against multiple Fulton State Hospital (FSH) employees, claiming violations of her substantive due process rights under the Fourteenth Amendment to the United States Constitution. On motions for summary judgment, the district court granted qualified immunity to four FSH employees, but denied qualified immunity to Michael Cox (Cox), Julie Houchins (Houchins), and Frances Joy (Joy). Cox, Houchins, and Joy appeal. We reverse.

## I.   BACKGROUND
### A.    Factual Summary
The ADA Unit is a 20-bed, inpatient substance abuse treatment facility for men and women. The ADA Unit has four unisex bathrooms located along a single hallway opposite patient bedrooms. When Beck was admitted, patients could not lock the bathrooms and bedrooms from the inside; only staff members could lock doors from the outside with a key. The testimony regarding the bathroom locking mechanisms was in conflict; however, we review the evidence in the light most

2

favorable to Beck. The ADA Unit also contained no internal surveillance cameras. Staff could observe and monitor the hallway, bathrooms, and bedrooms from a nurses' station located at one end of the hallway. ADA Unit policy requires a staff member to be present at the nurses' station at all times to monitor the hallway and to prevent patients from entering bedrooms other than their assigned room, or from entering a bathroom when occupied by another patient. Another ADA Unit policy requires staff members to perform and record visual verifications or "face checks" of each patient every fifteen minutes.

In April 2001, the Circuit Court of Boone County, Missouri, ordered Beck involuntarily committed to the ADA Unit for thirty days. Beck had no criminal history and was committed for abusing Xanax, which Beck used to treat her migraine headaches. At the time, Joy was the ADA Unit Manager charged with developing and implementing policies and procedures. Houchins, a registered nurse, worked as an evening shift supervisor in the ADA Unit. Cox, a substance abuse counselor assistant, also worked in the ADA Unit.

When Beck was admitted to the ADA Unit on April 17, 2001, she was the only female patient. On her first evening in the ADA Unit, Beck told her counselor and Houchins she was uncomfortable with and afraid of the male patients in the ADA Unit. Beck told Houchins male residents whistled at her and referred to Beck as "baby girl." Beck did not identify for Houchins any of the male patients whom Beck feared. Houchins comforted Beck and allowed her to dine that evening at the nurses' station away from the male patients.

The following evening, Beck joined other patients outside on the patio for a smoking break. Cox supervised the patients on the patio, and Houchins was assigned to the nurses' station. Cox and Houchins were the only two employees working in the ADA Unit. After Beck finished smoking, she re-entered the building. Cox remained outside with the other patients. Beck stopped by the nurses' station, saw

3

Houchins in the medication room preparing medications, spoke briefly to Houchins, and picked up a bath towel. Beck then collected some toiletries from her bedroom, and entered the bathroom farthest from the nurses' station. After Beck entered the unsecured bathroom, a male inpatient, D.P., slipped inside the bathroom, grabbed Beck, sexually assaulted her, and threatened to kill her children if she reported the assault. Following the assault, Beck showered and returned to her room. In the days immediately following the assault, D.P. repeatedly threatened Beck, telling her he knew where she lived and she best keep quiet, lest he would harm Beck and her children.

On April 25, 2001, Beck described for Houchins a "hypothetical" involving a patient being assaulted and threatened in a bathroom. Houchins asked Beck whether her inquiry concerned an actual event or a hypothetical situation. Beck responded she was describing a hypothetical. Houchins told Beck, if such an incident actually occurred, she would advise her supervisor and staff would deal with the incident. Houchins then asked Beck whether the unnamed patient in the hypothetical was D.P., and told Beck she would not report the hypothetical in her evening nursing notes based on Beck's fear that a staff member might show D.P. the nursing notes. Houchins was later disciplined for not reporting the hypothetical incident, and she did not appeal the discipline.

On April 26, 2001, Beck informed Joy about D.P.'s sexual assault and threats. Joy immediately removed Beck from the ADA Unit, and then Joy informed her supervisors of Beck's allegations. Later that day, D.P. was transferred to another FSH building, and Beck was returned to the ADA Unit, where Beck remained until her early discharge on May 2, 2001.

Beck's alleged assault was the first sexual assault known and reported to have occurred in the ADA Unit, although other patients and staff members had reported previous incidents of unwelcome sexual behavior. Before the alleged sexual assault

4

occurred, no patient in the ADA Unit had complained to Joy about D.P., nor did Joy know D.P. had a history of committing sexual assaults. However, Joy was aware D.P. was convicted of assault and was serving a 60-month sentence.

### B.    Procedural Summary

In March 2002, Beck filed this section 1983 lawsuit, alleging multiple FSH employees violated her substantive due process rights under the Fourteenth Amendment. In Count I, Beck alleged twelve defendants, including Cox, Houchins, and Joy, violated her substantive due process rights by recklessly or with deliberate indifference placing her in an unsafe environment and failing to protect her by inadequately supervising male patients in the ADA Unit. In Count II, Beck alleged several supervisory defendants, including Joy, implemented inadequate policies and failed to train or supervise properly ADA Unit staff members. In Count III, Beck alleged a state-law battery claim against D.P. based on the purported sexual assault.

After Beck's lawsuit was filed, five defendants were dismissed. The remaining seven defendants filed motions for summary judgment, contending the record failed to establish a substantive due process violation. Alternatively, the defendants argued if Beck had established a constitutional violation, they were entitled to qualified immunity. The district court concluded Beck failed to present a submissible case against several defendants, but had presented a submissible case on Count I against Cox and Houchins. The district court concluded:

> Houchins and Cox were the staff members on duty at the time of the rape on April 18, 2001. Houchins and Cox were not only aware of the general threat of violence posed by the patients in the ADA Unit, but Beck had expressed her specific fears and concerns directly to Houchins a day before the rape occurred, giving her time to deliberate regarding what actions were needed to protect Beck. Houchins and Cox also knew that Beck could not lock the bathroom door herself to provide security and therefore was particularly vulnerable if they failed to monitor visually the movement of ADA unit patients. Nonetheless, Houchins

5

and Cox failed to monitor the location of Beck and D.P. on the night of April 18, 2001, either by doing 15 minute "face checks" or by ensuring that a staff member was at the nurses' station at all times to prevent two people [from] entering the bathroom at the same time. A reasonable jury could, therefore, conclude that Houchins and Cox were aware that Beck had a substantial risk of serious harm and were deliberately indifferent to it.

(internal citations omitted).

On Count II, the district court granted summary judgment based on qualified immunity to several supervisory defendants, but denied summary judgment to Joy. The court reasoned:

[A] reasonable jury could conclude that Joy was deliberately indifferent to Beck's constitutional rights. As the Manager of the ADA Unit, Joy was aware that the Unit was designed to be co-ed, with only two staff members on duty at night, no interior security cameras, and doors that could not be locked from the inside. In addition, Joy testified that she knew that many of the patients had criminal histories and that substance abusers had a propensity to be violent. Further, it can be inferred from Joy's frequent presence in the ADA Unit that she knew that Beck was the only female patient in a Unit full of recovering male substance abusers with little or no self-control, leaving Beck particularly vulnerable to attack.

. . . Joy was on notice that the failure to train or supervise her staff was "so likely to result in a violation of constitutional rights that the need for training is patently obvious." However, instead of taking additional care to ensure that her employees were adequately trained and supervised, Joy overlooked rule violations. On at least one occasion, Joy was told that D.P. had been allowed to go behind the nurses' station, but Joy failed to take any action to discipline the staff members involved or enforce the policy. . . . In addition staff members testified that there were widespread rule violations, such as the frequent failure to do "face

6

checks" every 15 minutes as required by ADA Unit policy . . . . Given the layout of the facility, the number of staff on duty, the number/gender and history of the patients, a reasonable juror could conclude that Joy was aware that Beck was exposed to a substantial risk of harm if the staff violated rules . . . . In a case such as this, . . . a reasonable jury could conclude that Joy failed to exercise professional judgment and was in fact deliberately indifferent to Beck's constitutional rights.

Finally, Beck has established . . . that inadequate training and supervision caused her injury. If Cox and Houchins had followed ADA Unit policies and procedures by doing 15 minute face checks and ensuring that one staff member remained behind the nurses' station and in visual contact with the ADA Unit at all times, D.P. would not have been able to follow Beck into the bathroom.

(internal citations omitted).

On appeal, Cox, Houchins, and Joy contend Beck failed to allege a substantive due process violation. Alternatively, they argue if Beck has established a substantive due process violation, then they are entitled to qualified immunity because they were not provided fair warning their conduct manifested a violation of Beck's constitutional rights.

## II. DISCUSSION
### A. Qualified Immunity

A defendant is entitled to file an interlocutory appeal of a district court's denial of qualified immunity pursuant to the collateral order doctrine. Ottman v. City of Independence, Mo., 341 F.3d 751, 755-56 (8th Cir. 2003). "[O]ur review is limited to determining whether the official is entitled to qualified immunity based on the summary judgment facts as described by the district court." Hawkins v. Holloway, 316 F.3d 777, 781 (8th Cir. 2003). Our jurisdiction is limited to reviewing only "whether an official is entitled to immunity to the extent the question turns on an issue of law, but we may not review a district court's conclusion that the pretrial

7

record presents a sufficient factual dispute requiring a trial." Id. (citing Johnson v. Jones, 515 U.S. 304, 319-320 (1995)).

Generally, government officials are entitled to qualified immunity under section 1983 when executing discretionary functions, unless the officials violate clearly established law. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (holding "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). In considering the affirmative defense of qualified immunity, we must determine (1) whether the summary judgment facts establish a violation of Beck's substantive due process rights; and, if so, (2) whether the right was clearly established at the time of the alleged misconduct. See Saucier v. Katz, 533 U.S. 194, 201(2001). Only after a plaintiff has established a constitutional violation, does the court proceed to determine whether the right claimed was clearly established at the time of the violation. Id. Our focus in a qualified immunity analysis is not on the actions and omissions of private actors, but those of state actors, which Beck contends caused her injuries. See id.

## B. Substantive Due Process

The Supreme Court has declared, "[a]s a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). However, in DeShaney, the Court recognized two exceptions, known as the "special relationships" and "state created danger" exceptions. Id. at 197-202. Because Beck was involuntarily committed to the ADA Unit and was not free to leave of her own volition, this case implicates the first exception. The Supreme Court explained that "when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general well-

8

being." Id. at 199-200. This affirmative duty on the part of the state "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help [her], but from the limitation which it has imposed on [her] freedom to act on [her] own behalf." Id. at 200. The Court further explained:

> In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on [her] own behalf– through incarceration, institutionalization, or other similar restraint of personal liberty–which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect [her] liberty interests against harms inflicted by other means.

Id.

Earlier in Youngberg v. Romeo, 457 U.S. 307 (1982), a case involving a mentally retarded person involuntarily committed to a state institution, the Supreme Court reasoned that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Id. at 321-22. The Supreme Court declared involuntarily committed persons enjoy "constitutionally protected interests in conditions of reasonable care and safety," giving rise to an unquestioned state "duty to provide reasonable safety for all residents and personnel within the institution." Id. at 324. Because Beck was an involuntarily committed patient in the custody of the ADA Unit, the Fourteenth Amendment imposed upon the defendants, as state actors, an affirmative duty to undertake some responsibility for providing Beck with a reasonably safe environment.

While Beck, as an involuntarily committed person, retained a liberty interest in her safety, her constitutional interest is not absolute and, to some extent, is conflicting. Id. at 319-320. "Substantive due process offers only limited protections and only guards against the exercise of arbitrary and oppressive government power." Hawkins, 316 F.3d at 780. "Before official conduct or inaction rises to the level of

9

a substantive due process violation[,] it must be so egregious or outrageous that it is conscience-shocking." Burton v. Richmond, 370 F.3d 723, 729 (8th Cir. 2004) (Burton II) (citing County of Sacramento v. Lewis, 523 U.S. 833, 848 n.8 (1998); Hawkins, 316 F.3d at 780). In Lewis, the Supreme Court stated, "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." 523 U.S. at 847 n.8. Under a deliberate indifference standard, plaintiffs must show state actors engaged in conscious shocking behavior. Id. at 846-47. The Supreme Court has expressly ruled that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." Id. at 849.

When professionals are sued in their individual capacity, the Supreme Court has declared that courts must balance "the liberty of the individual" against the relevant state interest in determining whether an involuntarily committed individual's constitutional rights have been violated. Youngberg, 457 U.S. at 324. The Court has emphasized that "decisions made by the appropriate professional are entitled to a presumption of correctness . . . to enable institutions of this type–often, unfortunately, overcrowded and understaffed–to continue to function." Id. Because decisions made by a professional are presumptively valid, the Supreme Court explained "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323.

## C.    Defendants Cox and Houchins

Based on our review of the undisputed summary judgment facts, we cannot conclude the actions or inactions by Cox and Houchins describe conduct so egregious and so outrageous as to shock the contemporary conscience. Cox's failure to conduct "face checks" of the ADA Unit patients between 8:00 and 8:30 p.m. and Houchins's temporary absence from the nurses' station to fill medication orders constitute, at

10

most, a negligent omission and a negligent act, respectively, on which, D.P., the alleged rapist, capitalized to assault Beck. Nor can we conclude Cox's failure to conduct one, at most two, face checks of patients during a 20 to 30-minute time interval on the evening of April 18, or Houchins's temporary absence from the nurses' station to fill medications at the precise moment Beck entered the bathroom actually, or proximately, caused her alleged sexual assault.

The summary judgment facts do not permit a reasonable jury to conclude D.P., or any male inpatient on the ADA Unit, posed a known threat to Beck on April 18, 2001, and, even more clearly, the facts do not permit a jury to infer Cox and Houchins deliberately decided not to protect Beck from a known substantial risk of serious harm. Cox's and Houchins's conduct was not so egregious or outrageous that such conduct could be described as conscience-shocking behavior. Negligent conduct is not enough. We, therefore, conclude Beck failed to establish either Cox or Houchins violated Beck's substantive due process rights.

### D.    Defendant Joy

We suggest the district court failed to "show deference to the judgment exercised by [Joy,] a qualified professional." Id. at 322. The facts in this case fall considerably short of establishing Joy's training and supervisory decisions represented "a substantial departure from accepted professional judgment, practice, or standards." Id. at 323. The district court found Joy (1) failed to enforce certain ADA Unit policies and (2) failed to discipline employees who violated policies. The district court cited the ADA Unit policy of specifically prohibiting patients from leaning over or coming behind the nurses' station. The district court declared:

> [I]nstead of taking additional care to ensure that her employees were adequately trained and supervised, Joy overlooked rule violations. On at least one occasion, Joy was told that D.P. had been allowed to go behind the nurses' station, but Joy failed to take any action to discipline the staff members involved or enforce the policy. In fact, Joy testified

11

that she herself saw D.P. leaning over the desk at the nurses' station on more than one occasion, and simply told him that he could not "hang over the desk."

The district court did not address how this particular rule violation, and Joy's knowledge and alleged acquiescence in the violation, were causally related to Beck's sexual assault. Curiously, the district court granted summary judgment to a non-supervisory defendant, whom the summary judgment facts established had repeatedly violated this particular rule by permitting D.P. to walk behind the nurses' station and access patient charts. The court granted summary judgment because "Beck . . . failed to establish any connection between [this] violation[] and the rape." The same absence of a causal nexus between the policy violation and the subsequent sexual attack is equally applicable to Joy.

Absent evidence that Joy's supervisory and training decisions represented "a substantial departure from accepted professional judgment, practice, or standards," we conclude the court erred in finding a reasonable jury could conclude Joy failed to exercise professional judgment. Joy's supervisory actions and inactions in this case "simply [do] not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent." Davidson v. Cannon, 474 U.S. 344, 347-48 (1986) (concluding a lack of due care does not violate the Due Process Clause); see Burton II, 370 F.3d at 729 (reversing and directing entry of summary judgment "because defendants' actions were not conscience-shocking," and defendants were "entitled to qualified immunity because plaintiffs have failed to show a constitutional violation"); S.S. v. McMullen, 225 F.3d 960, 963-64 (8th Cir. 2000) (en banc) (holding state actors' alleged actions "did not rise to the level of egregiousness that is required to support an action for a substantive due process violation"). Based on the summary judgment facts, we cannot conclude any of the alleged state acts or omissions "shock[] the conscience," Lewis 523 U.S. at 846, or constitute "a substantial departure from accepted professional judgment, practice or standards," Youngberg, 457 U.S. at 323.

12

## III. CONCLUSION

We reverse the order of the district court and remand for entry of summary judgment in favor of Cox, Houchins, and Joy on the basis of qualified immunity. Beck still has her claim against the actual wrongdoer, D.P.

_____