Tommy N. SOPHAPMYSAY as Administrator of the Estate of Ammy Dovangsibountham, Plaintiff,

v.

CITY OF SERGEANT BLUFF, IOWA; Chief of Sergeant Bluff, Iowa Police Department David McFarland; Woodbury County; Woodbury County Attorney Tom Mullin; Assistant Woodbury County Attorney Paul Kittridge; Assistant Woodbury County Attorney Michelle Lauters; William L. Wegman, Iowa Public Defender; Assistant Iowa Public Defender Greg Jones; Assistant Iowa Public Defender Michelle Driebilbus; Terri Devoss; and Lori Limits, Defendants.

No. C00–4051–MWB.

United States District Court, N.D. Iowa, Western Division.

Aug. 5, 2002.

Elizabeth A. Row, Sioux City, IA, Shelley A. Horak, Horak & Associates, Sioux City, IA, for Plaintiff.

Michael J. Frey, Hellige, Lundberg, Meis, Erickson & Frey, Sioux City, IA, for Sergeant Bluff, IA.

Douglas L. Phillips, Klass, Stoik, Mugan, Villone & Phillips, LLP, Sioux City, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I.   *INTRODUCTION AND BACKGROUND* .....................................1030
    A.   *Procedural Background* ..............................................1030
    B.   *Factual Background* ..................................................1030

II.  *LEGAL ANALYSIS* .....................................................1038
    A.   *Standards For Summary Judgment* ....................................1038
    B.   *Analysis of Particular Claims* .......................................1039
        1.   *Substantive due process claim* ................................1039
            a.   *DeShaney decision and its progeny* ..........................1039
            b.   *The state-created danger exception* ..........................1040
            c.   *Analysis–County defendants* .................................1041
               i.   *Creation or increase in danger* ..........................1041
               ii.   *Shocks the conscience* ......................................1041
            d.   *Analysis-defendant Driebilbus* ..............................1042
        2.   *Prosecutorial immunity* .........................................1043

*III.  CONCLUSION* ...................................................1046

## I.  INTRODUCTION AND BACKGROUND

### A.  *Procedural Background*

Plaintiff Tommy N. Sophapmysay, in his capacity as the administrator of the estate of Ammy Dovangsibountham, filed this lawsuit on May 12, 2000, against various state, county and city officials and employees and Lori Davenport as the administrator of the estate of Sounthaly Keosay. At the center of this lawsuit is Ammy's murder by her stepfather Keosay on March 17, 1999. Keosay then killed himself. In Count I of his complaint, Sophapmysay alleges that all the named defendants violated 42 U.S.C. § 1983 by violating Ammy's rights to due process of law by failing to protect her from Keosay. Specifically, Sophapmysay alleges that defendants failed to fulfill their affirmative duty to protect Ammy from bodily harm even though defendants had knowledge that Keosay threatened Ammy's life if she testified against him. In addition, Sophapmysay alleges that defendants' established policy, practice, or custom of failing to protect juvenile child abuse witnesses permitted Keosay to murder Ammy. Sophapmysay also alleges that defendants had actual or constructive notice of their policy, practice, or custom of failing to protect juvenile child abuse witnesses. In Count II, Sophapmysay alleges a claim of negligence against defendants City of Sergeant Bluff, Woodbury County, Tom Mullin, in his official capacity as Woodbury County Attorney, William Wegman, in his official capacity as Iowa State Public Defender,

and Jessie Rasmussen, in his official capacity as Director of the Iowa Department of Human Services. Sophapmysay asserts that these defendants failed to properly supervise and control the conduct of defendants Dave McFarland, Paul Kittridge, Machelle Lauters, Terri DeVoss, Lori Limoges, and Michelle Driebilbus.[1] In Count III, Sophapmysay alleges a claim for wrongful death against all named defendants. Sophapmysay contends that defendants created a special relationship with Ammy by requesting that she provide information against Keosay and then failed to protect her from Keosay. In Count IV, Sophapmysay alleges a claim for tortious infliction of emotional distress against all named defendants. In Count V, Sophapmysay alleges a negligence claim against defendants Iowa Public Defender, Greg Jones and Michelle Driebilbus in their individual capacity. Sophapmysay contends that these defendants had an attorney client relationship with Ammy which they breached by failing to follow up on Keosay's bail status, failing to appear and represent her as guardian ad litem in the criminal prosecution against Keosay, and failing to advise Ammy that she had a right to representation by a guardian ad litem in all hearings concerning the criminal charges against Keosay. In "Count V," Sophapmysay asserts a claim of respondeat superior against defendants City of Sergeant Bluff, Woodbury County, the Iowa Department of Human Resources and the Iowa Public Defender's Office.[2] In Count VI, Sophapmysay asserts a claim for wrongful death against defendant Keo-

---

1.  Although the complaint refers to defendant Lori Limits, "Limits's" actual name is Lori Limoges. Therefore, the court will use Limoges actual name in this opinion but will continue to use "Lori Limits" in the caption to this case.

2.  Sophapmysay's complaint contains two Count V's. Therefore, for the purposes of this order, the court will refer to Sophapmysay's negligence claim as Count V and will refer to his respondeat superior claim as "Count V".

say and asserts that Keosay deliberately or negligently caused her death.[3] Sophapmysay asserts that under Iowa law these defendants are liable for the torts committed by their employees when the employees are acting within the scope of their employment.

Defendants Iowa Public Defender's Office, William Wegman, Greg Jones, Michelle Driebilbus, Iowa Department of Human Services, Jessie Rasmussen, Terri DeVoss and Lori Limoges moved to dismiss various portions of the complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). Specifically, these defendants asserted that Sophapmysay's due process claim must be dismissed because Sophapmysay had failed to plead a sufficient special relationship so as to state a constitutional claim. Defendants Iowa Public Defender's Office and the Iowa Department of Human Services argued that the claims against them are barred by the Eleventh Amendment. Defendants further assert that the claims contained in Count II against defendants William Wegman and Jessie Rasmussen must be dismissed because these defendants are being sued in their official capacity which is barred by the Eleventh Amendment. In addition, defendants contended that Counts III, IV, V, "V" and VI are barred by the Iowa Tort Claims Act. Defendants also contended that Sophapmysay's claims for respondeat superior against them fail to state claims for relief because, under Iowa law, claims of respondeat superior against state agencies are barred. Finally, defendants contended that any tort claims against them for punitive damages are barred by Iowa law.

The court granted in part and denied in part the motion to dismiss. The court concluded that the State of Iowa and its employees have Eleventh Amendment immunity. Thus, defendants Iowa Public Defender's Office, and Iowa Department of Human Services were dismissed from Counts I, III, IV, V, and "V." Defendants Wegman, Jones, Driebilbus, Rasmussen, DeVoss, Limoges, and Davenport were dismissed from Counts II, III, IV, V, and VI.[4] In addition, Wegman, Jones, Driebilbus, Rasmussen, DeVoss, Limoges, and Davenport, in their official capacities only, were dismissed from Count I. The court further concluded that Sophapmysay had made out sufficient allegations to set forth a substantive due process claim that defendants Wegman, Jones, Driebilbus, Rasmussen, DeVoss, Limoges, and Davenport violated Ammy's Fourteenth Amendment right to be free from state-created dangers to her bodily integrity. The court also concluded that the record before it did not permit it to determine, as a matter of law, whether the defendant public defenders here acted under color of state law when performing the responsibilities of their positions. Accordingly, the motion to dismiss was denied as to Sophapmysay's § 1983 claim against these defendants in their individual capacities.

On February 22, 2002, defendants Wegman, Jones, Driebilbus, Rasmussen, DeVoss, and Limoges (collectively "the State defendants" unless otherwise indicated) moved for summary judgment on all remaining claims against them. Specifically, the State defendants assert in their motion that they did not violate Ammy's due pro-

---

3. On July 24, 2000, Sophapmysay voluntarily dismissed her claims against Lori Davenport as administrator of the estate of Sounthaly Keosay.

4. At the conclusion of oral argument on defendants' motions for summary judgment, plaintiff's counsel inquired whether the court's ruling on the motions for summary judgment would include plaintiff's negligence claim against defendant Driebilbus. That negligence claim, contained in Count V, however, was previously dismissed by the court in its ruling on defendants' motion to dismiss.

cess rights. The State defendants further contend that neither defendant Wegman nor Jones had a supervisory relationship with Driebilbus and thus had no personal involvement subjecting them to liability under § 1983. The State defendants also assert that defendant Driebilbus did not act under color of state law, and that defendant Rasmussen had no personal involvement subjecting her to liability under § 1983. Finally, the State defendants contend that plaintiff Sophapmysay's claim against defendant Wegman does not survive his death.

On March 1, 2002, defendants Woodbury County, Iowa, Mullin, Kittridge and Lauters (collectively "the County defendants" unless otherwise indicated) moved for summary judgment on all claims against them. The County defendants contend that they did not violate Ammy's due process rights. The County defendants also argue that plaintiff Sophapmysay cannot establish that the County defendants were the proximate cause of any harm to Ammy. The County defendants further assert that they have prosecutorial immunity from suit.

On March 1, 2002, defendants City of Sergeant Bluff and McFarland (collectively "the City defendants" unless otherwise indicated) moved for summary judgment on all claims against them. The City defendants asserts that they did not take any action which placed Ammy in greater danger than she otherwise would have faced and therefore are entitled to summary judgment on plaintiff Sophapmysay's due process claim. The City defendants further contend that plaintiff Sophapmysay cannot establish that they violated policy or custom regarding child informants. The City defendants also assert that plaintiff Sophapmysay cannot establish that the City of Sergeant Bluff failed to properly train and supervise defendant McFarland. In addition, the City defendants contend that plaintiff Sophapmysay has no evidence that the City of Sergeant Bluff violated any standard of care in relation to its investigation of Ammy's allegations of sexual molestation by Keosay. Finally, the City defendants argue that plaintiff Sophapmysay has insufficient evidence of such extreme behavior as to warrant the submission of his claim for tortious infliction of emotional distress.

On April 4, 2002, after obtaining an extension of time, plaintiff Sophapmysay filed a timely response to defendants' motions for summary judgment. On April 8, 2002, the County defendants filed a reply brief in support of their respective motion for summary judgment. On April 23, 2002, after obtaining an extension of time, the City defendants filed a timely reply brief in support of their motion for summary judgment.

Pursuant to the parties' requests, the court set oral arguments on defendants' respective motions for summary judgment to be held on August 2, 2002. On August 1, 2002, plaintiff Sophapmysay dismissed his claims against all of the State defendants except Driebilbus, and the City defendants. The court proceeded with oral arguments on August 2, 2002. At the oral arguments, plaintiff Sophapmysay was represented by Shelley A. Horak, Sioux City, Iowa. Defendants Woodbury County, Iowa, Mullin, Kittridge and Lauters were represented by Doug Phillips of Klass, Stoik, Mugan, Villone, Phillips, Orzechowski, Clausen & Lapierre, Sioux City, Iowa. Defendant Driebelbis was represented by Deputy Attorney General Gordon E. Allen, Des Moines, Iowa.

The court turns first to a discussion of the undisputed facts as shown by the record, then to the standards applicable to motions for summary judgment and, finally, to the legal analysis of whether any of the defendants are entitled to summary

judgment on any of the claims at issue in this litigation.

### B. Factual Background

The following facts are undisputed. Greg Jones was, at all material times, an Assistant Public Defender in the Sioux City, Iowa office and was employed by the State of Iowa. Michele Driebilbus was, at all material times, employed at the Juvenile Law Center. Driebilbus was an Assistant Public Defender in the juvenile division of the Sioux City, Iowa, office, and employed by the State of Iowa. The Juvenile Law Center and the Woodbury County Public Defender's Office operate as two completely separate law offices. Jones works for the Public Defender and has no supervisory authority over either the Juvenile Law Center or Driebilbus.

Jessie Rasmussen was, at all material times, the director of the Iowa Department of Human Services. Lori Limoges and Terri DeVos were, at all material times, employees of the Iowa Department of Human Services in Sioux City, Iowa, and of the State of Iowa. Lori Limoges is a case manager for the Iowa Department of Human Services, and her duties include participation in juvenile court proceedings, contact with clients, establishing service programs and monitoring client progress. Terri DeVos is a child protective investigator.

Commencing at some point in 1996, Ammy Dovangsibountham's stepfather, Sounthaly Keosay, began to sexually molest her. Ammy confided in her mother, Anna Keosay, about Keosay's actions, but Keosay did not stop his behavior. On January 20, 1999, Keosay came into Ammy's bedroom and began to touch her. On January 21, 1999, Ammy awoke to find Keosay masturbating at the door to her room.

Ammy ran away from home on January 22, 1999, in order to escape the sexual abuse by her stepfather. Ammy's mother reported her missing, and Ammy was eventually located in Sioux City by police officers of the Sioux City Police Department, and transported to the Juvenile Detention Center. David MacFarland was the Chief of Police for the City of Sergeant Bluff. Chief McFarland and Joyce Treadway, a child protective intake worker, interviewed Ammy regarding her reasons for running away from home. Ammy told them that her stepfather had touched her in places she didn't want him to touch. Chief MacFarland's report of his initial interview with Ammy does not mention threats to kill Ammy if she talked about Keosay touching her. Treadway reported Ammy's allegations as sexual abuse. She reported no allegations of physical abuse or threats.

DeVos first met Ammy at the Juvenile Detention Center after DeVos was assigned the case. Ammy reported the repeated sexual abuse incidents committed by Keosay and also reported that she had told her mother, who had disbelieved her allegations. Ammy reported that she was "fearful" of Keosay, but did not give any specifics. DeVos does not recall any report to her by Ammy of a threat by Keosay to kill her. At the time of the initial assessment, there was no prior history of child abuse by Keosay nor was there any prior allegations of domestic abuse.

Chief MacFarland took Ammy to the Crittendon Center in Sioux City, Iowa, for her safety and had her admitted pending commencement of juvenile court proceedings. After McFarland and DeVos dropped Ammy off at the Crittendon Center, MacFarland and DeVos went to Ammy's home to inform Anna that Ammy had been found and where Ammy was staying. When told of the allegations of sexual abuse, Anna still refused to believe the allegations. MacFarland noted in his report that Anna had told DeVos that if

the allegations were true, she planned on sending Ammy to Texas. Plaintiff's App. Ex. 15 at 24.

After Ammy was placed at the Crittendon Center, the Sergeant Bluff Police Department began an investigation into Ammy's sexual abuse allegations. Based on Ammy's statements, DeVos prepared an Application for Removal in which Ammy's removal from her mother was sought on the grounds that Ammy would be in imminent danger of sexual abuse if not removed from the home. Attached to DeVos's application was her "Preliminary Report To The Court," which does not indicate that there was as yet any report of a threat to kill Ammy if she talked about the sexual abuse.

On February 1, 1999, a petition was filed by Michele Lauters of the Woodbury County Attorney's Office, alleging that Ammy was a Child In Need Of Assistance. In the petition, Lauters noted that Ammy was "unwilling to go home while her stepfather is in the home. She states that she is fearful of returning home while her step-father is in the home." State Defendants App. at 13. The application contains no report of a threat to kill Ammy by Keosay. The order setting a hearing on the petition appointed "the Youth Law Center" as guardian ad litem/attorney for Ammy. After which Driebilbus was Ammy's guardian ad litem/attorney.

On February 2, 1999, DeVos supervised a visit between Ammy and her mother. Both Ammy and her mother were upset during this visit. Ammy's mother talked about sending Ammy to Texas and Ammy indicated that she did not want to go to Texas. DeVos formed the impression that Anna was wavering between believing Ammy and believing Keosay.

On February 3, 1999, an interview with child protective services was set up for Ammy at Marian Health Center. Marjorie Sanderson of the Child Protective Center conducted the interview with Ammy. The interview was videotaped and viewed through a one-way mirror by DeVoss, Chief MacFarland and Tom Gill of the Sergeant Bluff Police Department. In the interview, which lasted approximately 53 minutes, Ammy described in detail Keosay's sexual abuse of her. Ammy reported that she attempted to tell her mother about the sexual abuse on July 4th. When Ammy accused her mother of loving Keosay more than her, her mother became angry and slapped Ammy.

During this interview, Ammy for the first time stated that Keosay had threatened to beat her to death if she told her mother:

> Ammy replied, "Sometimes I'd tell him that I was gonna tell my mom, and then he said if I did, he'd kill me—that he would beat me to death." The interviewer asked, "Did you think something like that might happen?" Ammy relied, "Not really." The interviewer asked, "Had he ever done anything that made you think he might do that?" Ammy replied, "No, he just threatened me."

The City Defendant's App. at 39. During this interview, Ammy indicated to the interviewer that she had apparently disregarded Keosay's threat not to tell because Ammy stated that she had told her mother, her friend Lilly, a seventeen year old boy named Daniel, and a girl named Noy about Keosay's sexual abuse of her. In fact, Keosay had known since July 1998, that Ammy had told her Mother that he was touching Ammy in her private parts because Anna had confronted Keosay about it.

On February 4, 1999, Chief MacFarland interviewed Anna Keosay about Ammy's condition and Ammy's allegations that Keosay had sexually abused her. DeVos participated in the interview. Anna confirmed that she had been told by Ammy

about Keosay's sexually molesting her. While Anna was reluctant to believe that Keosay had been sexually molesting Ammy for almost three years, she had confronted Keosay about the allegations. On February 8, 1999, Attorney Elizabeth Row entered her formal appearance as attorney for Ammy's mother, Anna.

On February 9, 1999, Driebilbus attended a professional staff meeting with Sandy Jacobsen and DeVos of the Iowa Department of Human Services, Dave Gross of Lutheran Social Services and Charlene Ellis of the Crittendon Center. The "presenting situation" was described as the sexual abuse by the step father who had now been kicked out of the home and a divorce had been filed. Ammy was described as wanting her "step dad [to] move out & she return home." State Defendants' App. at 30. The recommendations were to "Ensure that step-dad is not in the home, start services. Ammy can go home. Restraining order." State Defendants' App. at 31.

On February 10, 1999, Chief MacFarland and DeVos met Ammy at her school in Sergeant Bluff. At that time, Ammy placed two telephone calls to Keosay. These telephone calls were tape recorded and listened to by Chief MacFarland, DeVos and a Laotian translator. During these telephone calls, Keosay told Ammy that he had left her mother and had moved in with a friend. Ammy told Keosay that the reason she ran away was because of the way Keosay had touched her. Keosay told Ammy that he was wrong in doing that, he was sorry and wouldn't do it again.

On February 11, 1999, Limoges received Ammy's case. When Limoges received the case, Ammy's case plan had already been done. That case plan included therapy and counseling, both individual counseling and joint counseling with her mother, skill development, and a psychosocial eval-

uation. When Limoges first received the case, she spoke with DeVos but was not told anything about Keosay's threat. When Limoges first met with Ammy at the Crittendon Center, Limoges explained that she would be the case manager and that there would be an in-home worker.

On February 16, 1999, Keosay voluntarily gave a statement to Chief MacFarland. During this interview, Keosay admitted that he likes to hug Ammy and "smell her" but denied touching her private parts or showing his penis to her. Keosay also denied threatening Ammy. At the conclusion of the interview, Chief MacFarland telephoned Assistant Woodbury County Attorney Paul Kittridge and relayed to Kittridge the contents of Keosay's statement. Chief MacFarland had previously talked to Kittridge about the case. Kittridge told Chief MacFarland to go ahead and arrest Keosay and to take him to jail. Keosay was arrested, charged with sexual abuse in the third degree, and was booked into the Woodbury County Jail. The affidavit signed by Chief MacFarland set out Ammy's claim that Keosay had threatened to kill her if she told her mother about the sexual abuse. At his initial appearance, Keosay's bond was set at $50,000. Keosay was unable to post. The office of the public defender was appointed to represent Keosay. Keosay's prosecution was assigned to Assistant Woodbury County Attorney Paul Kittridge.

On February 18, 1999, attorney Row, as Anna's attorney, faxed to DeVos a copy of the Petition for Dissolution of Marriage she had filed on behalf of Anna on February 17, 1999. No request for a temporary retraining order was included in the petition, but, instead, Row asked that Keosay be given "reasonable visitation rights."

Limoges attended a planning conference prior to Ammy's scheduled pre-trial conference in juvenile court. At the planning

conference, among the topics of discussion was the restraining order and how to get Ammy back home and safe. All the participants at the planning conference were in agreement that Ammy could go home. The participants knew that Keosay was in jail, that Anna had filed for divorce, and that a no-contact order had been issued by the juvenile court. Moreover, Anna now believed Ammy and services were in place. Limoges does not recall any telephone conferences or calls with the Woodbury County attorney's office or the Assistant Woodbury County Attorney assigned to Ammy's juvenile case prior to the pre-trial conference in juvenile court.

On February 24, 1999, DeVos completed Part A of her assessment and provided copies to Driebilbus, as attorney-guardian ad litem for Ammy, the county attorneys, Row, as Anna's attorney, to Limoges, and the juvenile court. Part B of DeVos's assessment was also completed on February 24, 1999. It does not contain a reference to Keosay's threat but does note Ammy's "strong desire" to return home. State Defendants' App. at 46.

On February 24, 1999, a pre-trial conference was held in Ammy's juvenile court proceeding. The State of Iowa appeared by Assistant Woodbury County Attorney Marlene Loftus. The Iowa Department of Human Services appeared by Lori Limoges and Terri DeVos. Ammy was represented by her court-appointed guardian ad litem, Assistant Woodbury County Public Defender Michelle Driebilbus. At some point, Ammy had told Driebilbus that she did not think that Keosay would kill her, but would instead hit her as he had done in the past.

The parties agreed to seek a modification of the placement order pending final adjudication of Ammy's juvenile court proceeding so that Ammy could return home with her mother. An application was presented to Judge Michaelson requesting a transfer of Ammy's custody to her mother. Judge Michaelson granted the application and placed Ammy in her mother's custody thereby permitting Ammy to return home. Judge Michaelson directed that there be no contract between Ammy and Keosay.

Limonges had a second meeting with Ammy shortly before she was to go home. They discussed Ammy's eagerness to go home. The also discussed that Ammy was to call immediately if she ever felt scared or fearful, or if she saw Keosay around. Limoges does not remember Ammy ever indicating to her that she was afraid of Keosay. After Ammy returned home, Limoges had no further contact with her. Limoges received no telephone calls from Ammy or Anna. There were no reports of major concerns for Ammy's safety.

Benita Triplett of the Crittendon Center prepared a Shelter Care Program summary shortly before Ammy's release. Triplett reported that Ammy was able to "express her feeling and concerns in an appropriate manner." State Defendants' App. at 53. There is no mention in Triplett's report of any threat by Keosay towards Ammy.

On February 25, 1999, Assistant Woodbury County Attorney Kittridge approved the filing of three counts of sexual abuse in the third degree against Keosay. Kittridge filed a trial information and Keosay's bond was continued in the amount of $50,000. Assistant Woodbury County Public Defender Mike Williams was appointed to represent Keosay. On March 3, 1999, Keosay appeared in court for his arraignment and entered a plea of not guilty. The matter of Keosay's bond was brought up. Williams asked Kittridge to consider a reduction in Keosay's bond and suggested the sum of $13,000. Kittridge agreed to the reduction in Keosay's bond because Keosay was no longer living at the house, there was a no-contact order in

place, and Anna had filed for divorce. At that time, Kittridge knew that Ammy had reported Keosay's threat to kill her. A request for a reduced bond for Keosay was presented to an Iowa district court judge. The judge granted the request for a reduction in Keosay's bond and bond was set at $13,000.

Driebilbus did not enter an appearance in the criminal case against Keosay and thus was not served with any notice of hearings, or orders entered in the case. The Juvenile Law Center relies on the Woodbury County Attorney's Office to notify them regarding the bond status of any particular defendant. Driebilbus had no contact from Kittridge concerning Keosay.

When Keosay's bond was reduced, Kittridge did not notify Driebilbus, as attorney for Ammy, or have any conversations with DeVos. Keosay was able to post bond and he was released from the Woodbury County Jail on the evening of March 3, 1999. The Woodbury County Attorney's Office did not consult with Chief MacFarland on the issue of reducing Keosay's bond nor did it notify him of the reduction in Keosay's bond. Limoges was not informed that Keosay had been released from jail. DeVos had no conversations with Kittridge or Lauters concerning Keosay's release from jail. After Keosay's release from jail, Kittridge had no further contact with Ammy or her mother. The Woodbury County Attorney's Office does not have a policy to coordinate efforts between the juvenile division which is in charge of child protection and the felony division which is in charge of criminal prosecution of child abuse crimes.

Kittridge believed that the threat from Keosay was a "control technique" and was not considered a "true threat to commit harm..." State Defendants' App. at 90. Until this case, Kittridge was not aware of any other where the threat had actually been carried out.

On the evening of March 3, 1999, Chief MacFarland was advised by one of his officers that Keosay had been released from jail. Later that evening, Ammy called Chief MacFarland at his home. Ammy was extremely upset. She told him that Keosay had bonded out of jail and she was afraid that he would come back and kill her. Ammy was staying at a location in Sioux City. MacFarland told Ammy that, if she wanted, to stay at this location in Sioux City and he would telephone her school for her to tell them that she wouldn't be in the next day. MacFarland then called an on-duty Sergeant Bluff Police Officer from his home and told the officer, Russ Kenney, to make extra patrols on the residence of Anna Keosay and to advise the later shift to make extra patrols.

On March 4, 1999, Chief MacFarland contacted Kittridge to find out why Keosay had been released from jail. MacFarland told Kittridge that he did not agree with the lowering of Keosay's bond and reminded Kittridge that Keosay had threatened to kill Ammy. Kittridge told MacFarland that Keosay did not have a criminal record. On March 4, 1999, Chief MacFarland informed the Sergeant Bluff High School and Terry Devos of Keosay's release.

On March 4, 1999, Michelle Lauters learned that Keosay had been released from jail. She did not, however, know how long he had been out. On March 5, 1999, Ammy's attorney Driebilbus learned that Keosay had been released from jail. She learned this from Elizabeth Row, Anna's attorney. Williams, the assistant public defender appointed to represent Keosay, did not consult with Driebilbus nor inform her about Keosay's bond reduction or his release. Driebilbus learned that Ammy was already aware of Keosay's release. Driebilbus called Ammy on March 5, 1999, to discuss the no contact order with

Ammy. During the telephone conversation, Ammy stated that she really wasn't that worried about Keosay but expressed concern that the no-contact order should be expanded to include her mother.

Between March 4, 1999, and March 17, 1999, Chief MacFarland told his officers to watch the area of the trailer court where Ammy and her mother lived. Chief Mac-Farland did not receive any further contact from Ammy after the March 3, 1999, telephone call.

Tonya Meier, the in-home service worker, visited Ammy at her home. Meier was aware that Keosay had been released from jail, but she was also aware that a no-contact order had been issued and was in place. Meier believed that Anna was taking the appropriate precautions to safeguard Ammy. This was demonstrated by the fact that Anna left a Sunday picnic with Ammy upon learning that Keosay was in attendance. At no time did Ammy express to Meier any fears for herself or request that she be removed from the home.

On March 17, 1999, officers of the Sergeant Bluff Police Department discovered the bodies of Ammy, Anna, and Keosay. Keosay had murdered both Ammy and Anna before committing suicide.

On June 18, 1999, William Wegman, Director of the Office of the Offender Advocate in Des Moines, died. An estate was opened by his son, Patrick, an attorney in Charles City, Iowa. No claim on behalf of the estate of Ammy Dovangsibountham was filed in the Wegman estate.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 in a number of prior decisions. *See, e.g., Swanson v. Van*

*Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir. 2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact*

*and that the moving party is entitled to judgment as a matter of law.*

Fed. R. Civ. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377 (same). With these standards in mind, the court turns to consideration of the defendants' respective motions for summary judgment.

## B. Analysis of Particular Claims

### 1. Substantive due process claim

#### a. *DeShaney* decision and its progeny

The court initially takes up plaintiff Sophapmysay's substantive due process claim which alleges that all of the defendants violated Ammy's Fourteenth Amendment right to be free from state-created dangers to her bodily integrity.

In *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 191, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), a child and his mother brought a § 1983 action against state caseworkers, alleging that the caseworkers had violated the child's right to substantive due process by failing to protect him from his father's physical abuse. When the child was treated at a hospital for bruises and abrasions, the defendant recommended that the boy be placed in the hospital's temporary custody. *See id.* at 192, 109 S.Ct. 998. Three days later, a team of social workers determined that there was insufficient evidence of child abuse and that the child should be returned to his father's custody. *See id.* Later, caseworkers who were monitoring the child's home, observed numerous suspicious injuries, and were twice informed of such injuries by medical personnel. The caseworkers, however, took no action to protect the child from his father. *See id.* at 192–93, 109 S.Ct. 998. The child subsequently was severely beaten and suffered severe brain damage. *See id.* at 193, 109 S.Ct. 998. The United States Supreme Court explained that the Due Process Clause of the Fourteenth Amendment does not guarantee certain minimal levels of safety and security. *Id.* at 195, 109 S.Ct. 998. Thus, as a general rule, the failure of the state to protect a person against private violence does not amount to a violation of the Due Process Clause.

*Id.* While recognizing that the general rule forecloses governmental liability for the failure to protect persons from injury at the hands of private actors, the Supreme Court noted in *DeShaney* that, in certain limited circumstances, the Constitution imposes upon state actors affirmative duties of care and protection with respect to particular individuals. *DeShaney*, 489 U.S. at 198, 109 S.Ct. 998. The Court observed, however, that because the state actors "played no part in [the] creation" of the dangers facing the plaintiff, the state owed no duty to the plaintiff:

> Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

*Id.* at 201, 109 S.Ct. 998. Thus, as courts have interpreted this statement, " "[w]hen state actors knowingly place a person in danger, the due process clause of the constitution ... render[s] them accountable for the foreseeable injuries that result from their conduct.' " *Mark v. Borough of Hatboro*, 51 F.3d 1137 (3d Cir.) (quoting *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 199 (5th Cir.), cert. denied, 514 U.S. 1017, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995)), *cert. denied*, 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995).

### b. *The state-created danger exception*

■ Following *DeShaney*, several federal circuit courts of appeals, including the Eighth Circuit Court of Appeals, have recognized two exceptions to *DeShaney's* rule that state actors have no constitutional duty to protect people from each other: "(1) in custodial settings, where the state itself has limited the individuals' ability to care for themselves, and (2) when the state is responsible for placing an individual in a position of danger which otherwise would not exist." *Shrum v. Kluck*, 249 F.3d 773, 781 (8th Cir.2001) (citing *Doe v. Wright*, 82 F.3d 265, 268 (8th Cir.1996)); *see Norfleet ex rel. Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir.1992) (*en banc*). The later exception, upon which Sophapmysay relies, applies where the state affirmatively puts a person in a position of danger that the person would not otherwise have been in but for the state's intervention. *See S.S. ex rel. Jervis v. McMullen*, 225 F.3d 960, 962 (8th Cir.2000) (*en banc*) (noting that constitutional tort may be committed where "state acts affirmatively to place someone in a position of danger that he or she would not otherwise have faced ..."); *Greer v. Shoop*, 141 F.3d 824, 827–28 (8th Cir.1998) (recognizing the existence of the state-created danger theory of constitutional liability); *Davis v. Fulton County, Ark.*, 90 F.3d 1346, 1351 (8th Cir. 1996) ("A duty to protect has also been recognized in the circuit courts when the state affirmatively places a particular individual in a position of danger that she would not otherwise have faced."); *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir.1992) ("We have held the Due Process Clause imposes a duty on state actors to protect or care for citizens in two situations: first, in custodial and other settings in which the state has limited the individuals' ability to care for themselves;

and second, when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced."), *cert. denied,* 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993); *Freeman v. Ferguson,* 911 F.2d 52, 55 (8th Cir.1990) ("It is not clear, under *DeShaney,* how large a role the state must play in the creation of danger and in the creation of vulnerability before it assumes a corresponding constitutional duty to protect. It is clear, though, that at some point such actions do create such a duty."); *see also Kneipp v. Tedder,* 95 F.3d 1199 (3d Cir.1996); *Uhlrig v. Harder,* 64 F.3d 567, 572 n. 7 (10th Cir.1995), *cert. denied,* 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996); *Dwares v. City of New York,* 985 F.2d 94, 99 (2d Cir.1993); *Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993). In addition to requiring that the state actor's conduct must have increased the danger of significant harm to a particular individual, in order for those actions to give rise to a violation of substantive due process rights the actions must "shock the conscience." *Shrum,* 249 F.3d at 781; *accord Terry B. v. Gilkey,* 229 F.3d 680, 684 (8th Cir.2000); *McMullen,* 225 F.3d at 964. Mere allegations of negligence are insufficient. *Terry B.,* 229 F.3d at 684; *McMullen,* 225 F.3d at 964.

### c. Analysis–County defendants

### i. Creation or increase in danger

■ The uncontested facts of this case do not support a claim that the County defendants affirmatively acted to create or increase the danger to Ammy. Ammy did not indicate to any of the County defendants that Keosay had been threatened that if she disclosed his sexual abuse to

her mother that he would kill her. Indeed, Ammy only mentioned being threatened by Keosay once, and that disclosure occurred during an interview at the Child Protection Center five days after she had been in the custody of the Iowa Department of Human Services. Moreover, there is no evidence that Ammy was in fear of imminent physical harm, or was concerned about the threat of imminent physical harm from Keosay.[5] After Keosay had made the threat to kill Ammy if she revealed the sexual molestation to her mother, Ammy nonetheless went ahead and disclosed Keosay's sexual abuse to Anna. Keosay knew that Ammy had told her mother about the abuse because Anna had confronted Keosay about it. The importance of this fact is that it significantly undermines the credibility of Keosay's threat in light of the fact that the trigger to action under his threat had already occurred.

While defendant Kittridge had involvement in the decision to reduce the amount of Keosay's bail bond, the decision to reduce Keosay's bond was ultimately a judicial decision of the Iowa district court. When Tonya Meier, the in-home service worker, visited Ammy at her home, Ammy did not express to Meier any fears for herself or request that she be removed from the home. At no time after Keosay's release from jail did Ammy request further intervention on the part of the County defendants to safeguard her from him. Thus, from the record before the court, the court finds that the County defendants' actions in this case did not create or enhance the danger to Ammy.

### ii. Shocks the conscience

The Tenth Circuit Court of Appeals has provided the following definite standard to

---

5. The court notes that although Ammy reported that she was "fearful" of Keosay to DeVos during their initial meeting, Ammy did not give any specifics and did not mention Keosay's threat to kill her.

**1042**

use when analyzing state-created-danger claims which may give rise to § 1983 liability:

> [M]any state activities have the potential for creating some danger—as is true of most human endeavors—but not all such activities constitute a "special" danger giving rise to § 1983 liability. For the state to be liable under § 1983 for creating a special danger (i.e. where a third party other than a state actor causes the complained of injury), a plaintiff must allege a constitutionally cognizable danger. That is, the danger creation theory must ultimately rest on the specifics of a substantive due process claim—i.e. a claim predicated on reckless or intentional injury—causing state action which "shocks the conscience."

*Uhlrig v. Harder,* 64 F.3d 567, 572 (10th Cir.1995) (citation omitted). As noted above, the Eighth Circuit Court of Appeals has also adopted the requirement that the state actor's actions must "shock the conscience" in order to give rise to a violation of substantive due process rights.

■ Assuming, *arguendo,* that the County defendants' failure to oppose Keosay's reduced bail bond increased the danger of significant harm to Ammy, the court concludes that the County defendants conduct, when viewed in total, does not shock the conscious. Kittridge agreed to the reduced bail bond for Keosay because Keosay did not have a criminal record. Moreover, Keosay did not have a history of violent behavior, he had made no contemporary threats to Ammy's safety, and a no contact order was in place prohibiting him from contacting Ammy. Finally, the court notes that the County defendants' action in not opposing a reduced bail bond for Keosay was no assurance that Keosay's bail bond would be reduced and he would be released. The ultimate decision to reduce Keosay's bond was a judicial decision of the Iowa district court. Given the record

before the court, the court cannot conclude that defendants' actions here shock the conscience. Thus, the court concludes that plaintiff Sophapmysay cannot establish his substantive due process claim against defendants. Therefore, this portion of the County defendants' motion for summary judgment is granted.

### d. Analysis-defendant Driebilbus

■ The court also concludes that the uncontested facts of this case do not support a claim that defendant Driebilbus affirmatively acted to create or increase the danger to Ammy. There is no evidence in the record that Ammy ever indicated to Driebilbus that she was in fear of being killed by Keosay. On the contrary, Ammy had told Driebilbus that she did not think that Keosay would kill her, but would instead hit her as he had done previously. Thus, when Driebilbus undertook to represent Ammy she was unaware that Keosay posed a mortal danger to Ammy nor could she have reasonably anticipated the danger he posed to Ammy. Moreover, Keosay had been arrested and was being held in jail at the time of the February 24, 1999, pre-trial conference in Ammy's CINA proceeding. It was at this proceeding that the Iowa juvenile court agreed to modification of the placement order pending final adjudication of Ammy's juvenile court proceeding so that Ammy could return home with her mother. Judge Michaelson directed that there be no contact between Ammy and Keosay. Significantly, it was following this hearing that Keosay's bond was reduced. Driebilbus, however, had no involvement in the decision to reduce the amount of Keosay's bail bond. She was not consulted regarding the issue of the lowering of Keosay's bail bond nor was she informed about Keosay's subsequent release from jail. As noted above, the decision to reduce Keosay's bond was ultimately a judicial decision of the Iowa district

court upon which Driebilbus had no control. When Driebilbus learned of Keosay's release two days after it had occurred, she immediately telephoned Ammy to alert her to this fact. During the telephone conversation, Ammy stated that she really wasn't that worried about Keosay but expressed concern that the no-contact order should be expanded to include her mother. At no time after Keosay's release from jail did Ammy request further intervention on the part of Driebilbus to safeguard her from him. Thus, from the record before the court, the court finds that defendant Driebilbus's actions in this case did not create or enhance the danger to Ammy. Therefore, defendant Driebilbus's motion for summary judgment is granted.[6]

### 2. Prosecutorial immunity

The County defendants contend they are entitled to assert prosecutorial immunity from plaintiff Sophapmysay's lawsuit because the actions of Kittridge and Lauters were taken in their respective capacities as advocates for the State—Kittridge as the prosecutor in the felony case against Keosay, and Lauters as a prosecutor in the CINA proceeding.

■ A prosecutor's ability to seek absolute prosecutorial immunity has been long-established in the common law. The United States Supreme Court has specifically extended the common law doctrine of prosecutorial immunity to Section 1983 damages suits for alleged civil rights violations, insofar as the prosecutor's conduct is performed to initiate prosecution or to carry the case through the judicial process. *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). On the other hand, prosecutors may not utilize the cloak of prosecutorial immunity, but rather, only qualified immunity, when they engage in activities outside their quasi-judicial role, such as investigatory or administrative functions. *Id.* at 430, 96 S.Ct. 984. Further, the Court established that to determine whether the prosecutor's actions are more closely akin to the function of an advocate rather than of an investigator or administrator, the court must determine whether the prosecutor's conduct is "intimately associated with the judicial phase of the criminal process." *Id.* at 430–31, 96 S.Ct. 984.

■ Federal courts have concluded that a number of actions taken by a prosecutor are so intimately associated with judicial roles so as to afford prosecutorial immunity. *See Kalina v. Fletcher,* 522 U.S. 118, 123, 118 S.Ct. 502, 139 L.Ed.2d

---

**6.** Because the court has granted defendant Driebilbus's motion for summary judgment on this ground, the court need not tarry long on her alternative argument for summary judgment—that defendant Driebilbus did not act under color of state law. Based on the record before the court, the court finds that defendant Driebilbus, as a court appointed guardian ad litem/attorney for Ammy, performed "traditional lawyer functions" before the juvenile court and therefore did not act under color of state law. *See Polk County v. Dodson,* 454 U.S. 312, 324, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (holding that a public defender does not act under "color of state law" when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding); *Bolin v. Chavez,* 24 Fed.

Appx. 936, 939–40, 2001 WL 1585758, at *3 (10th Cir. Dec.12, 2001) (holding that court-appointed guardian ad litem for child in child custody dispute did not act under color of state law); *Malachowski v. City of Keene,* 787 F.2d 704, 710 (1st Cir.) (holding that private attorney who acted as court-appointed counsel for child in state juvenile delinquency proceedings was not acting under color of state law), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *Meeker v. Kercher,* 782 F.2d 153, 154 (10th Cir.1986) (holding that guardian ad litem representing a minor in a state proceeding on a petition alleging abuse was not acting under color of state law). Thus, defendant Driebilbus's motion for summary judgment is also granted on this ground.

471 (1997)(holding that the prosecutor's activities in preparing and filing an information and motion for an arrest warrant were protected by absolute immunity); *Burns v. Reed*, 500 U.S. 478, 492, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (presenting evidence at probable cause hearing in support of a motion for a search warrant); *Ireland v. Tunis*, 113 F.3d 1435, 1443 (6th Cir. 1997) (holding that a state prosecutor is shielded by absolute prosecutorial immunity when he decides to bring forth criminal charges, seeks an arrest warrant, or presents documents to a judicial officer); *Esteves v. Brock*, 106 F.3d 674, 677 (5th Cir.) (use of peremptory challenges in racially discriminatory manner were protected by absolute immunity), *cert. denied*, 522 U.S. 828, 118 S.Ct. 91, 139 L.Ed.2d 47 (1997); *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1266 (8th Cir.) (holding that prosecutor was entitled to absolute immunity for reviewing polygraph results to determine whether charges should be dismissed, where defense counsel brought polygraph test to prosecutor in order to persuade him to dismiss case), *cert. denied*, 519 U.S. 867, 117 S.Ct. 179, 136 L.Ed.2d 119 (1996); *Geter v. Fortenberry*, 849 F.2d 1550, 1555 (5th Cir.1988) (misconduct in setting trial date). Nevertheless, federal courts have also identified alleged activities that are outside the scope of a prosecutor's judicial roles, entitling the prosecutor only to qualified immunity. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 274–75, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (allegedly fabricating false evidence to attain arrest and indictment of suspect; out-of-court statements to media regarding suspect); *Burns*, 500 U.S. at 492–93, 111 S.Ct. 1934 (providing legal advice to police on the propriety of hypnotizing suspect under investigation); *Mitchell v. Forsyth*, 472 U.S. 511, 524, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (authorizing a warrantless wiretap); *McGee v. Broz*, 251 F.3d 750, 752 (8th Cir.2001) (prosecuting attorney who signed

and filed the criminal complaint was entitled to qualified immunity). A defendant has the burden of proving that his or her conduct is intimately associated with the judicial phase of the criminal process to warrant absolute prosecutorial immunity. *Forrester v. White*, 484 U.S. 219, 224, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988).

■■■ Here, Kittridge's actions with regard to the level of bail that Keosay warranted constituted acts at the core of the prosecutorial function and therefore he is entitled to absolute prosecutorial immunity. *Myers v. Morris*, 810 F.2d 1437, 1446 (8th Cir.) (Noting that acts encompassed within the protected function of initiating a case include advocating a particular level of bail), *cert. denied*, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); *Lerwill v. Joslin*, 712 F.2d 435, 438–39 (10th Cir. 1983) (same).

■■■ Plaintiff Sophapmysay contends that Kittridge does not have prosecutorial immunity here because he improperly bypassed a statutory procedure, under Iowa Code § 915.37, for appointment of guardian ad litems in a criminal case with a minor prosecuting witness. The court finds this argument unpersuasive because the court concludes that defendant Kittridge did not act in violation of Iowa Code § 915.37. That section provides as follows:

> A prosecuting witness who is a child, as defined in section 702.5, in a case involving a violation of chapter 709 or section 726.2, 726.3, 726.6, or 728.12, is entitled to have the witness's interests represented by a guardian ad litem at all stages of the proceedings arising from such violation. The guardian ad litem shall be a practicing attorney and shall be designated by the court after due consideration is given to the desires and needs of the child and the compatibility of the child and the child's interests with the prospective guardian ad litem. If a

guardian ad litem has previously been appointed for the child in a proceeding under chapter 232 or a proceeding in which the juvenile court has waived jurisdiction under section 232.45, the court shall appoint the same guardian ad litem under this section. The guardian ad litem shall receive notice of and may attend all depositions, hearings, and trial proceedings to support the child and advocate for the protection of the child but shall not be allowed to separately introduce evidence or to directly examine or cross-examine witnesses. However, the guardian ad litem shall file reports to the court as required by the court. If a prosecuting witness is fourteen, fifteen, sixteen, or seventeen years of age, and would be entitled to the appointment of a guardian ad litem if the prosecuting witness were a child, the court may appoint a guardian ad litem if the requirements for guardians ad litem in this section are met, and the guardian ad litem agrees to participate without compensation.

IOWA CODE § 915.37. Because in the case of Ammy's CINA proceeding, a guardian ad litem was previously appointed for Ammy, the Juvenile Law Center should have been appointed to serve as her guardian ad litem in the felony criminal prosecution of Keosay.

Defendants contend that it is not the duty of a county attorney under Iowa law to fulfill the appointment obligations set out under Iowa Code § 915.37. The duties of Iowa county attorneys under Iowa Code Chapter 915 are set out in Iowa Code §§ 915.12 and 915.13. Iowa Code § 915.12 provides:

1. The county attorney shall be the sole registrar of victims under this subchapter.

2. A victim may register by filing a written request-for-registration form with the county attorney. The county attorney shall notify the victims in writing and advise them of their registration and rights under this subchapter.

3. The county attorney shall provide a registered victim list to the offices, agencies, and departments required to provide information under this subchapter for notification purposes.

4. Notwithstanding chapter 22 or any other contrary provision of law, a victim's registration shall be strictly maintained in a separate confidential file, and shall be available only to the offices, agencies, and departments required to provide information under this subchapter.

IOWA CODE § 915.12. Iowa Code § 915.13, in turn, sets out the notification obligations of a county attorney as follows:

1. The county attorney shall notify a victim registered with the county attorney's office of the following:

a. The scheduled date, time, and place of trial, and the cancellation or postponement of a court proceeding that was expected to require the victim's attendance, in any criminal case relating to the crime for which the person is a registered victim.

b. The possibility of assistance through the crime victim compensation program, and the procedures for applying for that assistance.

c. The right to restitution for pecuniary losses suffered as a result of crime, and the process for seeking such relief.

d. The victim's right to make a victim impact statement, in one or both of the following formats:

(1) Written victim impact statement. Notification shall include the procedures for filing such a statement.

(2) Oral victim impact statement, delivered in court in the presence of the defendant. The victim shall also be notified of the time and place for such statement.

e. The date on which the offender is released on bail or appeal, pursuant to section 811.5.

f. Except where the prosecuting attorney determines that disclosure of such information would unreasonably interfere with the investigation, at the request of the registered victim, notice of the status of the investigation shall be provided by law enforcement authorities investigating the case, until the alleged assailant is apprehended or the investigation is closed.

g. The right to be informed of any plea agreements related to the crime for which the person is a registered victim.

2. The county attorney and the juvenile court shall coordinate efforts so as to prevent duplication of notification under this section and section 915.24.

IOWA CODE § 915.12.

It is evident upon review of these two sections that neither imposes upon a county attorney the obligation to assure that the appointment of a guardian ad litem, as required by Iowa Code § 915.37, is carried out by the Iowa district court. As a practical matter, while a county attorney would be wise to bring to the court's attention the fact that a child witness may have the right to have a guardian ad litem appointed to represent that witness, the Iowa statutory scheme does not impose that duty on a county attorney. Consequently, the court concludes that plaintiff Sophapmysay has not demonstrated that Kittridge improperly bypassed the statutory procedure set out in Iowa Code § 915.37 for appointment of guardian ad litems for minor witnesses in criminal cases such that he would be stripped of his absolute prosecutorial immunity.

▮ The court also concludes that defendant Lauter has absolute immunity for any role she played in the decision to initiate or continue the CINA proceedings involving Ammy. The court notes that every circuit that has addressed the question, including the Eighth Circuit Court of Appeals, has concluded that government attorneys who prosecute child neglect actions perform "functions analogous to those of a prosecutor [and] should be able to claim absolute immunity with respect to such acts." *Gray v. Poole*, 243 F.3d 572, 577 (D.C.Cir.2001); *see Myers*, 810 F.2d at 1452; *see also Snell v. Tunnell*, 920 F.2d 673, 692–94 (10th Cir.1990); *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 397 n. 11 (4th Cir.1990); *Walden v. Wishengrad*, 745 F.2d 149, 152 (2d Cir.1984).

Accordingly, the court concludes that the County defendants are entitled to assert prosecutorial immunity from plaintiff Sophapmysay's lawsuit. Therefore, this portion of the County defendants' motion for summary judgment is also granted.

### III.  CONCLUSION

The court initially concludes that the uncontested facts of this case do not support a claim that defendants affirmatively acted to create or increase the danger to Ammy. The court further concludes that even assuming, *arguendo*, that defendants' failure to oppose Keosay's reduced bail bond increased the danger of significant harm to Ammy, the defendants' conduct, when viewed in total, was not conscience shocking such as to constitute a violation of substantive due process. Finally, the court concludes that the County defendants are entitled to assert prosecutorial immunity from plaintiff Sophapmysay's lawsuit. Therefore, the County defendants' and defendant Driebilbus's respective motions for summary judgment are **granted.**

**IT IS SO ORDERED.**